WILLIAM H. H. MILLER, Respondent, *v.* GIFFORD PINCHOT and Others, Appellants.

First Department, February 23, 1934.

*Sidney Newborg* of counsel [*Kurzman & Frank,* attorneys], for the appellants.

*Isidor Enselman* of counsel [*Louis I. Hochstein* with him on the brief; *Louis I. Hochstein,* attorney], for the respondent.

TOWNLEY, J. Plaintiff, a real estate salesman, brought this action as assignee of his wife, a licensed real estate broker, to recover commissions. He claims to have negotiated a lease of certain property owned by defendants upon terms satisfactory to them. The lease was never closed because defendants refused to consent to a $900,000 mortgage to finance the building to be erected upon the property by the tenant. The proposed tenant, Joseph G. Siegel, refused to make the lease unless this condition was accepted. There is no claim that any of the defendants personally ever consented to it. Plaintiff relies entirely upon a consent said to have been given by Carreau who is claimed to have been defendants' agent in the transactions. That any such consent was ever given is denied by Carreau who is corroborated in his denial by Frank, the attorney for the defendants. The finding of the jury that such consent was given is rightly questioned as being against the weight of the evidence. Assuming this fact to have been properly determined in favor of the plaintiff, however, no authority in Carreau to make such agreement was shown.

Carreau was an independent real estate broker who had sold this property to the defendants. In April, 1928, he sent out circulars to real estate brokers generally, offering this property for

sale. The circular contained a statement that full commissions would be allowed to brokers. Plaintiff received one of these circulars and called on Carreau. He was not prepared to produce a buyer but thought he could interest a builder, whom he knew, in a leasing proposition which involved the erection of a new building upon the property.

The arrangement arrived at is a matter of some controversy between plaintiff and defendants. Plaintiff testified that he was originally employed as a broker entitled to full commissions. Carreau claims that plaintiff was merely a subbroker under himself and entitled to only part commissions and that the offer of full commissions contained in the original circular was limited to a sale of the property and had no application to a lease. Some time after this first conversation, plaintiff signed a letter in which he described his status as follows:

"September 15th, 1928.

" Cyrille Carreau, Inc.,
        " 101 Park Avenue,
            " New York City.

" Gentlemen: Pursuant to our original arrangement, it is understood that my commissions as sub-broker under you, should the Pinchot-Siegel lease of premises at 105th Street and Amsterdam Avenue be consummated, shall be the sum of four thousand dollars ($4000), and that in the event that the lessee or its assigns exercise the option to purchase which may be contained in the said lease, no further commissions shall be payable.

" Very truly yours,
            " J. W. MILLER."

We are of the opinion that the plaintiff's status is more accurately expressed in the letter than in his oral testimony, notwithstanding his claim that he was compelled to sign this letter by Carreau's improper insistence that he take less than the full commission. In confirmation of this view, it will be noted that the plaintiff limited his claim to commissions in his complaint to $4,000 as stated in the letter, although his commissions as sole broker would have amounted to considerably more.

The original conversation took place sometime in April, 1928. The negotiations dragged during the late spring and summer on account of the illness of Carreau and the absence of Mr. Pinchot in Europe. On August 13, 1928, Carreau wrote Siegel outlining the terms of the proposition which he had submitted to Mr. Pinchot. In this letter he said: " Referring to my conversation with you over the telephone yesterday, I would say that we originally presented a tentative proposition to Mr. Pinchot averaging $26,000

a year for his property which he declined to accept. Subsequently, on July 12th, I wrote him and outlined to him the following proposition.   *   *   *

" Tenant to take premises subject to present first mortgage of $200,000.   Tenant to agree to erect a fifteen or sixteen story apartment house with plans subject to owner's approval.   Tenant to be privileged to borrow on first mortgage and fee not to exceed two-thirds of the appraised value of the land and new building, or to borrow the full amount allowed by such Savings Bank or Institution as may meet with the owner's approval.   *   *   *

" It might be well to emphasize to you now that while Mr. Pinchot is favorably inclined to such a proposition as I have outlined in my letter it is not subject to any modification in any of its essential terms.   If the details of the proposed lease can be worked out in a skeleton manner I believe that upon Mr. Pinchot's return from abroad, which will be the first of September, that the matter can be closed up."

Plaintiff saw this letter and so was advised at the outset that the acceptance of the deal was dependent upon Mr. Pinchot's approval.

Prior to this letter Siegel had insisted on a mortgage of $900,000 as one of the essential terms of the lease.   Pinchot, Carreau and Frank, Pinchot's attorney, all testified without contradiction that Pinchot consistently refused to accede to this demand and insisted that the mortgage should not be for more than was customarily loaned by savings banks and similar institutions.   He was unwilling to burden this property with a larger mortgage and run the risk of losing it through foreclosure if the proposed venture was not a success.

On September nineteenth Carreau wrote plaintiff, clearly indicating that Mr. Pinchot's personal approval was essential in all matters connected with the lease.   In this letter he said: " I also informed you that he had instructed me to proceed with the negotiations of a lease with an average rental of $27,000 as per schedule of rental included in a letter to Mr. Siegel, *subject to his approval* upon his return to New York."   (Italics ours.)   Plaintiff's own testimony clearly shows that to have been his understanding.   Plaintiff also testified that on or about October twentieth he discussed with Mr. Siegel the question of subordination and that Mr. Siegel had said: " On those conditions [*i. e.*, getting a $900,000 subordination], he [Siegel] says, I am ready to close the deal.   I said, Very well.   *I will take that and submit it to Mr. Carreau and see whether Mr. Pinchot will approve of that.*"   (Italics ours.)   He further testified that then he reported to Carreau that Siegel was ready to close provided the defendants consented to subordinate their fee to a mortgage

of $900,000. To this Carreau replied: " I will take this up now *with Mr. Pinchot* and I will let you know." (Italics ours.)

On October twenty-fourth Gladstone wrote Carreau that Siegel was no longer interested in the deal unless he were able to procure the $900,000 mortgage. Carreau answered and suggested a conference. The conference of October thirtieth resulted. It was at this conference that it is claimed an agreement was reached. The persons present at this meeting were Siegel, the proposed tenant, Gladstone, his lawyer, Frank, and Carreau. At this meeting it is claimed, according to the testimony of Siegel, that " Mr. Frank turned around to Mr. Carreau and said, ' Is this deal acceptable to Mr. Pinchot? ' And Mr. Carreau said, ' Yes, it is acceptable.' Then he said, ' Well, then I'll proceed and get up the leases.' " Gladstone testified that he did not hear this conversation and such conversation is denied by both Frank and Carreau. Mr. Pinchot refused to agree to the mortgage and the matter was finally dropped.

Plaintiff never made any demand upon the defendants for commissions and did not bring this action until nearly two years after the conference in which it is claimed his commissions were earned. He never sent any bill to Carreau and his only demand was one claimed to have been made orally to Carreau's secretary in May of 1930, more than a year and a half after the conference.

The only occasion on which plaintiff met Pinchot was on September 18, 1928. He was in Carreau's office when Mr. Pinchot came in. Only rents were discussed, according to plaintiff, and there was no conversation about the mortgage at all. The conversation was as follows: " I [plaintiff] don't know whether I can get you any more rent or not, but I will endeavor to do so. I will see Mr. Siegel and see what I can do and I will let you know about it. ' Well,' he said, ' you needn't let me know. You can continue your negotiations right along with Mr. Carreau,' and I says, ' very well.' Now, Mr. Pinchot's conversation with me only lasted about five minutes."

It is this conversation upon which plaintiff relies as establishing authority in Carreau to bind defendants by an agreement to subject their property to a mortgage of $900,000. Obviously, this conversation falls far short of establishing what the plaintiff claims for it. Clearly, the conversation was not a consent to subordination. The subject was never mentioned. The direction to " continue your negotiations " with Carreau means just that. Certainly this cannot be construed as an authorization to agree to a $900,000 mortgage.

That Carreau's connection with the entire matter was solely that of broker and that he had no authority to make any agree-

ments except upon the express approval of Mr. Pinchot is borne out by all of the circumstances connected with the transaction. In a letter to plaintiff, as far back as August, 1928, Carreau clearly indicated that the final determination of all questions involved rested in Mr. Pinchot. This position is again restated in the letter of September nineteenth and according to the plaintiff's own testimony when he reported to Carreau on or about October twentieth that Siegel was insisting on a $900,000 mortgage as a condition of the deal, Carreau replied that he would refer it to Mr. Pinchot and let him know. It will be borne in mind that this conversation took place only nine days prior to the time when the plaintiff claims that Carreau had full authority to represent the defendant with respect to the amount of this mortgage and long after plaintiff's conversation with Pinchot. There is no testimony indicating that Carreau's status was changed in any respect between that date and the date when the transaction is claimed to have been closed. There is nothing indicating any holding out by defendants of Carreau as their agent. Carreau's only connection with the defendants was shown to have been that he had acted as broker for them in one or two transactions and that he was renting agent of the property which was to be subject to the proposed lease. He was never defendant's general agent.

This judgment cannot be sustained unless it may be said that a casual conversation had between plaintiff and Mr. Pinchot on September eighteenth was sufficient to bind him to an agreement involving a mortgage of over $900,000, which, according to the conceded testimony in the case, he consistently refused to make. The record in this case is entirely inadequate to support such a finding.

The judgment should be reversed, with costs, and the complaint dismissed, with costs.

FINCH, P. J., MARTIN, O'MALLEY and GLENNON, JJ., concur.

Judgment reversed, with costs, and complaint dismissed, with costs.